# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**Aluma Construction Corporation,**

    Plaintiff,

        v.

**Puerto Rico Ports Authority, et. al.,**

    Defendants.

CIVIL NO. 14-1610 (DRD)

## OMNIBUS OPINION AND ORDER

Pending before the Court are co-defendant, Puerto Rico Maritime Authority's (hereinafter, "PRMTA") *Motion to Dismiss* (Docket No. 59) and Plaintiff, Aluma Construction Corporation's (hereinafter, "Aluma") *Omnibus Amended Motion for Partial Summary Judgment and Opposition to Motion to Dismiss* (Docket No. 60).

For the reasons stated herein, the Court **DENIES** PRMTA's Motion to Dismiss and **GRANTS** Aluma's Amended Motion for Partial Summary Judgment.

## I.       PROCEDURAL BACKGROUND

On August 8, 2014, maintenance services company, Aluma, filed a Complaint against the Puerto Rico Ports Authority (hereinafter, "PRPA")[1] and PRMTA under federal admiralty law. The events that lead to the complaint are two claims for maintenance and repair services provided to two different vessels, "M/V Cayo Blanco" and "M/V Santa María", which are property of co-defendant, PRMTA. According to

---

[1] A dismissal without prejudice was entered in favor of PRPA on February 11, 2015. *See* Docket No. 23.

Aluma, those services are unpaid as PRMTA refuses to pay based on their interpretation of the applicable federal maritime and Commonwealth of Puerto Rico laws. *See* Docket No. 27, p. 2 ¶ 4. Consequently, Aluma argues that both of these claims are overdue, liquid and enforceable. Aluma further alleges that prior extrajudicial collection efforts have been made without success. Id. at ¶ 5.

Aluma is seeking partial summary judgment concerning the claim of $25,000.00 for certain emergency work that was provided to repair the four exhaust systems (mufflers) of the "M/V Cayo Blanco". *See* Docket No. 27 pp. 5-6. According to Aluma, the work was performed under an emergency verbal order for goods and services, issued by then Executive Director, Eng. Fernando Cedeño, through the executives duly in charge of service and maintenance of the PRMTA vessels. Aluma alleges that PRMTA's officers made a representation that such a minuscular expense did not require a written contract and was within the power of the Director to authorize a verbal order. Additionally, these repairs were performed by Aluma in an emergency basis since they were needed in order to comply with the United States Coast Guard's (hereinafter, "USCG") strict requirements, to be able to provide transportation services of goods and passengers between the main island and Vieques and Culebra as to the passenger vessel "M/V Cayo Blanco". *See* Docket No. 60. PRMTA submitted its opposition to Aluma's motion for partial summary judgment. *See* Docket No. 63. Aluma also filed a motion to supplement its request for partial summary judgment. *See* Docket No. 66.

Notwithstanding, PRMTA is seeking dismissal of the entire claim alleging that it is an instrumentality of the Commonwealth of Puerto Rico; thus, it is immune under the

Eleventh Amendment from suits in the federal court absent its consent. Proper analysis of Aluma's and PRMTA's motions require careful scrutiny of the underlying legal framework.

## II.     FACTUAL FINDINGS

The following factual findings are taken from the parties' statement of undisputed facts, Plaintiffs' unopposed statement of uncontested facts[2], and supporting documentation. Upon careful review of the record, the Court finds the following facts are undisputed:

1. On January 2010, a verbal order was presented to Aluma, for the performance of certain emergency work, to be provided to the vessel "M/V Cayo Blanco". (Docket No. 60-3 pp. 33-34).

2. "M/V Cayo Blanco's" repair work was ordered and authorized, originally, by the then Executive Director of PRMTA, Eng. Fernando Cedeño, and so it was represented to Aluma, in the person of Mr. Carlos Claudio, by Mr. Arturo Vaello, the officer in charge of fleet maintenance for the PRMTA. (Docket No. 60-3 pp. 32, 54 and 57).

3. Mr. Vaello was the person who originally contacted Aluma and requested that Aluma personnel present themselves at Fajardo, with the necessary equipment, to perform emergency repairs to "M/V Cayo Blanco". (Docket No. 60-3 pp. 32-33).

---

[2] The major drawback on PRMTA's failure to answer Aluma's Statement of Uncontested Facts (Docket No. 60-1) is that "statement of material facts . . . shall be deemed admitted," but only "if supported by record citations" as required by Local Rule 56. Not properly answering and/or opposing a summary judgment request under Local Rule 56(c) is "at their own peril." *See* Local Rule 56(c) and (e); *see also* <u>Morales v. A.C. Orssleff's EFTF</u>, 246 F.3d 32, 33 (1st Cir. 2001).

4. On January 2012, Aluma performed emergency work to the four exhaust systems (mufflers) of the "M/V Cayo Blanco", as required. (Docket No. 60-3 p. 30 and Docket No. 60-8).

5. The required work was approved on the 6th day of January of 2012, by Lieutenant Jeff Manion of the U.S. Coast Guard, Marine Inspection Department. (Docket No. 60-8).

6. An invoice of said work was presented on January 30, 2012 for a total amount of $25,000.00, as previously announced and agreed. Notwithstanding repeated attempts to collect, said amount remains unpaid. (Docket No. 60-7)

7. On December 30, 2011, the United States Coast Guard issued form CG-835 requiring that certain repairs be made to the vessel "M/V Cayo Blanco", prior to allowing passenger transport in the vessel. (Docket No. 60-6 and 60-3 pp. 30-32).

8. On January 2012, said form was delivered to Aluma, with the specific order that the repairs required in the form, pertaining to the mufflers of the "M/V Cayo Blanco", be performed forthwith, on an emergency character. (Docket No. 60-3 pp. 32-33).

9. The emergency work consisted in the repair of the four exhaust systems (mufflers) of the "M/V Cayo Blanco". (Docket No. 60-3 p. 32).

10. During the period of January 3 to January 6, 2012, the repair work was performed by Aluma. (Docket No. 60-8).

11. On January 30, 2012, Mr. Carlos González [representing Aluma] sent a letter to Mr. Arturo Vaello describing the repairs made to "M/V Cayo Blanco". (Docket No. 60-8).

12. The above-mentioned letter, sent by Mr. Carlos González, was received and signed by Mr. Arturo Vaello on January 31, 2012. (Docket No. 60-8).

13. Once the repairs works were finished, the vessel was inspected and approved by Mr. Arturo Vaello, fleet maintenance manager of PRMTA, at the time. (Docket No. 60-3 p. 33).

14. On January 30, 2012, and invoice was issued by Aluma for the emergency repair works that were performed, approved and accepted. (Docket No. 60-7 and 60-8).

15. The total amount invoiced for the work performed, was $25,000.00. (Docket No. 60-7).

16. Photographs of the repair work were taken to evidence that the repairs were made. (Docket No. 60-4).

17. The USCG approved the repair made to "M/V Cayo Blanco" and the vessel was authorized to continue providing transport services. (Docket No. 60-7 and 60-3 p. 32-33).

18. The purpose of the emergency repairs was to qualify the vessel for [USCG] certification. (Docket No. 60-3 p. 11).

19. Those changes were necessary to comply with the "rules and regulations of regulatory services" requested by the USCG. (Docket No. 60-3, pp. 66-67).

20. The USCG had issued an 835 form, disqualifying "M/V Cayo Blanco" from carrying passengers, until certain items were repaired, inspected and approved. (Docket No. 60-3, p. 31-32).

21. There was urgency requiring the vessel back in service, hence, Mr. Vaello contacted Mr. Claudio of Aluma, on an emergency basis, and requested the immediate repair of the vessel's mufflers. (Docket No. 60-3, p. 32).

22. There was no purchase order issued by PRMTA to perform the "M/V Cayo Blanco" vessel repairs; there is no record in the agency of any document to sustain that allegation. (Docket No. 63-1).

### III. APPLICABLE LAW

#### A. *Maritime Jurisdiction*

Pursuant to Article III of the United States Constitution, Federal Courts have jurisdiction over all admiralty and maritime law ([t]he judicial power shall extend to all cases... of admiralty and maritime jurisdiction). U.S.C.A Const. Art. III § 2. Moreover, pursuant to 28 U.S.C. § 1333 ("[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of... [a]ny civil case of admiralty or maritime jurisdiction..."). "A claim cognizable only in the admiralty or maritime jurisdiction is an admiralty or maritime claim for those purposes, whether or not so designated." Fed. R. Civ. P. 9(h)(1).

It is beyond debate that federal courts have jurisdiction of admiralty and maritime matters because of the recognized necessity of national control over this important commercial area. *See* J. Ray McDermott & Co. v. Vessel Morning Star, 457 F.2d 815 (5th Cir. 1972). Moreover, in Kossick v. United Fruit Co., 365 U.S. 731, 739 (1961), the Supreme Court correctly expressed that maritime law constitutes federal law, displacing local [state] interest no matter how pressing and significant, thus, federal law is supreme because of its constitutional implications, as follows:

> . . . the fact that maritime law is—in a special sense at least, (citations omitted)—federal law and therefore supreme by virtue of Article VI of the Constitution carries with it the implication that **wherever a maritime**

**interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant**. But the process is surely rather one of accommodation, entirely familiar in many areas of overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern. Surely the claim of federal supremacy is adequately served by the availability of a federal forum in the first instance and of review in this Court to provide assurance that the federal interest is correctly assessed and accorded due weight. (Emphasis ours).

"The delegation of cognizance of 'all civil cases of admiralty and maritime jurisdiction' to the courts of the United States comprehends <u>all maritime contracts</u>, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea." <u>DeLovio v. Boit</u>, 7 F. Cas. 418, 444 (C.C.D. Mass. 1815) (Emphasis ours). The place of execution and the place of performance of a contract does not determine whether a contract is within admiralty jurisdiction or not. Rather, "[i]f a contract is determined to be "maritime in nature" then it is a maritime contract and causes of action arising from that contract will fall within the admiralty jurisdiction of the federal courts." 14A Fed. Prac. & Proc. Juris. § 3675 (4th ed.).

"To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case." <u>Norfolk S. Ry. Co. v. Kirby</u>, 125 S. Ct. 385, 393, (2004). "Nor can we simply look to the place of the contract's formation or performance. Instead, the answer "depends upon ... the nature and character of the contract," and the true criterion is whether it has

"**reference to maritime service or maritime transactions**." <u>Id</u>. at 393. (Emphasis ours).

*See* <u>North Pacific S.S. Co. v. Hall Brothers Marine Railway & Shipbuilding Co.</u>, 249 U.S. 119, 125, (1919) (citing <u>Insurance Co. v. Dunham</u>, 11 Wall. 1, 26, 20 L.Ed. 90 (1871)).

Most critical and determinative, Federal courts have traditionally held that contracts to repair a ship fall within the umbrella of admiralty jurisdiction. *See* <u>Kossick</u>, 365 U.S. at 735; (citing <u>Endner v. Greco</u>, 3 F. 411, 412–413 (S.D.N.Y. 1880) (holding that a contract for furnishing repairs to a ship already built is held to be maritime.) "<u>Such contracts, for repairs on ships are governed by the Suits in Admiralty Act, 46 U.S.C. §§ 741–752 (1982), a body of law judicially entrusted to the United States District Courts</u>." <u>Jo-Mar Corp. v. United States</u>, 15 Cl. Ct. 602, 607 (1988); *see* <u>United States v. United Continental Tuna Corp.</u>, 425 U.S. 164, 172, 96 S.Ct. 1319, 1324, 47 L.Ed.2d 653 (1961); <u>Whitey's Welding & Fabrication v. United States</u>, 5 Cl.Ct. 284, 285–87 (1984). If subject matter of contract is the repair or refitting of a ship, contract is within maritime jurisdiction of the federal court. *See* <u>Hinkins S.S. Agency v. Freighters, Inc.</u>, N.D.Cal.1972, 351 F.Supp. 373, affirmed 498 F.2d 411. "Contracts for the repair of ships are governed by admiralty law." <u>Point Adams Packing Co. v. Astoria Marine Const. Co.</u>, 594 F.2d 763, 766 (9th Cir. 1979) (citing <u>New Bedford Dry Dock Co. v. Purdy</u>, 258 U.S. 96, 99 (1922)).

Furthermore, in maritime law, oral contracts are traditionally regarded as valid. <u>Kossick</u>, 365 U.S. at 734. **"For it is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law."** <u>Orient Mid-E. Great Lakes Serv. v. Int'l Exp. Lines, Ltd.</u>, 207 F. Supp. 127, 129 (D. Md. 1962), rev'd, 315 F.2d 519 (4th Cir. 1963) (citing <u>Kossick</u>, 365 U.S. at 735) (Emphasis ours). Therefore, the instant case is

seen by the District Judge under maritime law, since repair of vessels are considered under maritime jurisdiction and maritime jurisdiction preempts state law. Federal law supersedes state law in maritime cases when maritime interest is involved. "Wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant." *See* <u>Kossick</u>, 365 U.S. at 739. But as discussed infra, works performed for $25,000.00 or less if contracted as an emergency do not require either bidding or other contractual formalities.

### B. *Motion for Summary Judgment Standard*

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *See* <u>Johnson v. Univ. of P.R.</u>, 714 F.3d 48, 52 (1st Cir. 2013); <u>Prescott v. Higgins</u>, 538 F.3d 32, 40 (1st Cir. 2008) (citing <u>Thompson v. Coca–Cola Co.</u>, 522 F.3d 168, 175 (1st Cir. 2008)); *see also* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-250 (1986); <u>Calero–Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004). The analysis with respect to whether or not a "genuine" issue exists is directly related to the burden of proof that a non-movant would have in a trial. "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 255 (applying the summary judgment standard while taking into account a higher burden of proof for cases of defamation

against a public figure).  In order for a disputed fact to be considered "material" it must have the potential "to affect the outcome of the suit under governing law." Sands v. Ridefilm Corp., 212 F.3d 657, 660–661 (1st Cir. 2000) (citing Liberty Lobby, Inc., 477 U.S. at 247–248); Prescott, 538 F.3d at 40 (1st Cir. 2008) (citing Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)).

The objective of the summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citing the advisory committee note to the 1963 Amendment to Fed. R. Civ. P. 56(e)).  The moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact on the record.  Shalala, 124 F.3d at 306.  Upon a showing by the moving party of an absence of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate that a trier of fact could reasonably find in his favor.  Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The non-movant may not defeat a "properly focused motion for summary judgment by relying upon mere allegations," but rather through definite and competent evidence.  Maldonado–Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  The non-movant's burden thus encompasses a showing of "at least one fact issue which is both 'genuine' and 'material.'"  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990); see also Suarez v. Pueblo Int'l., 229 F.3d 49, 53 (1st Cir. 2000) (stating that a non-movant may shut down a summary judgment motion only upon a showing that a trial-worthy issue exists).  As a result, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment."

Liberty Lobby, Inc., 477 U.S. at 247–248. Similarly, summary judgment is appropriate where the nonmoving party rests solely upon "conclusory allegations, improbable inferences and unsupported speculation." Ayala–Gerena v. Bristol Myers–Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

When considering a motion for summary judgment, the Court must "draw all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013) (reiterating Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013)). The Court must review the record as a whole and refrain from engaging in the assessment of credibility or the gauging the weight of the evidence presented. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Pina v. Children's Place, 740 F.3d 785, 802 (1st Cir. 2014). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves, 530 U.S. at 150 (quoting Anderson, 477 U.S. at 250–51).

The Court further points out that when ruling upon a motion for summary judgment, a party's improper answering and/or opposing a summary judgment request under Local Rule 56(c) is "at their own peril". On that same note, in Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33, the First Circuit established ". . . a lesson in summary judgment practice" regarding the consequences of improperly answering a motion for summary judgment as follows:

We recently reiterated, with reference to this particular rule, that "parties ignore [it] at their own peril," and that "failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies deeming the facts presented in the movant's statement of undisputed facts admitted." <u>Morales v. A.C. Orssleff's EFTF</u>, 246 F.3d at 33 (1st Cir. 2001) (citing <u>Ruiz Rivera v. Riley</u>, 209 F.3d 24, 28 (1st Cir.2000)).

Summarizing, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact **and the movant is entitled to judgment as a matter of law.**" (Emphasis provided). *See* Fed. R. Civ. P. 56(a).

Hence, in order to prevail, Defendant must demonstrate that, even admitting well-pleaded allegations in light most favorable to Plaintiff, the applicable law compels a judgment in its favor.

### C.    *State Immunity under Eleventh Amendment*

The Eleventh Amendment of the Constitution of the United States provides the following:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state or by citizens or subjects of any foreign state.

U.S. Const. Amend XI.

Puerto Rico has long been considered a state for Eleventh Amendment purposes. *See* <u>Irizarry–Mora v. Univ. of Puerto Rico</u>, 647 F.3d 9 (1st Cir. 2011); <u>Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth.</u>, 991 F.2d 935 (1st Cir. 1993). "The Eleventh Amendment bars the recovery of damages in a federal court against the Commonwealth of Puerto Rico, and, by the same token, it bars the recovery of damages in official capacity suits brought against Puerto Rico officials where recovery will come from the public fisc."

Culebras Enterprises Corp. v. Rivera Rios, 813 F.2d 506, 516 (1st Cir. 1987) (citing Ramirez v. P.R. Fire Service, 715 F.2d 694, 697 (1st Cir. 1983) and Kentucky v. Graham, 473 U.S. 159 (1985)) (emphasis in the original); Maysonet–Robles v. Cabrero, 323 F.3d 43 (1st Cir. 2003). The problem is that the corporation that requested the services is not an "arm of the state" and therefore, does not enjoy Eleventh Amendment immunity, for the reasons explained by the Court hereafter.

The determination as to whether an entity is an arm of the state entitled to immunity requires a two-step analysis: "[t]he first step of the analysis concerns how the state has structured the entity."; and if structural indicators point to different directions "... the vulnerability of the state's purse [which] is the most salient factor in the Eleventh Amendment determination." Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico & Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 65 (1st Cir. 2003).

In Fresenius, an action was brought directly against a corporation for the collection of moneys and/or damages. The First Circuit held that "[w]here it is clear that the state treasury is not at risk, then the control exercised by the state over the entity does not entitle the entity to Eleventh Amendment immunity." Id. "The control asserted by the state is an important guide to the initial inquiry. But where the evidence is that the state did not structure the entity to put the state treasury at risk of paying the judgment, then the fact that the state appoints the majority of the governing board of the agency does not itself lead to the conclusion that the entity is an arm of the state." Id. at 68.

Moreover, the First Circuit recently addressed the controversy of state immunity under the Eleventh Amendment as to the PRPA, in the case of <u>Grajales v. Puerto Rico Ports Auth.</u>, 831 F.3d 11, 21 (1st Cir. 2016), as follows:

> The first structural indicator is Puerto Rico law's characterization of PRPA. We focus on PRPA's enabling act (the "Act"). P.R. Laws Ann. tit. 23 § 331, et seq.10 Like the enabling act in Fresenius, this one "does not by its terms structure [PRPA] to be an arm of the [Commonwealth]." <u>Fresenius</u>, 322 F.3d at 68. We thus need to determine what signals the Act nevertheless sends.
>
> In <u>Fresenius</u>, we concluded that, far from indicating that the public corporation at issue was structured to be an "arm," the relevant Puerto Rico enabling act characterized the entity in terms that "suggest[ed] exactly the opposite." Id. There, the act referred to the entity as one "independent and separate from any other agency or instrumentality of the Government of the Commonwealth of Puerto Rico." P.R. Laws Ann. tit. 24 § 343a (emphasis added).
>
> Following <u>Fresenius</u>, we addressed another Puerto Rico enabling act that, like the one in Fresenius, did not expressly characterize the public corporation at issue as an arm of the Commonwealth. *See* <u>Pastrana–Torres</u>, 460 F.3d at 126–27 & n. 2. Rather, the relevant Puerto Rico enabling act referred to the entity as a "public corporation" and "an instrumentality of the Commonwealth of Puerto Rico ... with a juridical personality that is independent and separate from any other entity, agency, department or instrumentality of the Government of Puerto Rico." P.R. Laws Ann. tit. 27 § 501. Relying on <u>Fresenius</u>, we concluded that this language also suggested that the public corporation at issue was not an arm. <u>Pastrana–Torres</u>, 460 F.3d at 126–27 & n. 2."

The First Circuit further assessed PRPA's immunity under the Eleventh Amendment as to whether the Commonwealth would be liable for actions against PRPA:

> PRPA has failed to show that this action poses any risk to the Commonwealth's fisc. PRPA does not contend, and we see no basis for concluding, that the Commonwealth would, as a legal matter, be liable for a judgment against PRPA in this case. *See* P.R. Laws Ann. tit. 23 § 333(b). In addition, the Commonwealth did not structure PRPA so that the Commonwealth would be liable, as a practical matter, for any such adverse judgment. In this regard, we note that the Commonwealth designed PRPA

to raise enough revenue to shoulder its own costs, including its litigation costs, and to bear its own debts, including (generally) any judgments against it. Id. at 29.

Accordingly, consistent with Fresenius and Grajales since, the First Circuit resolved that PRPA does not enjoy sovereign immunity since it is not considered an arm of the state. "It would be every bit as much an affront to the state's dignity and fiscal interest were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty." Fresenius, 322 F. 3d at 63.

D.    PRMTA's Enabling Act

Act number 1 of January 1, 2000 (amended by Act 231 of August 26, 2004, Act 52 of August 4, 2009, and Act 103 of July 23, 2014) also known as *Maritime Transport Authority of Puerto Rico and the Municipality Islands Act*, PR. ST. T. 23 § 3202, et. seq., is PRMTA's enabling act. As part of its legal analysis, the Court must review articles within PRMTA's enabling act that are applicable to the instant controversies.

First, the Court reviews Puerto Rico's description of PRMTA. Thus, PRMTA's enabling act does not describe the corporation as an arm of the state. Instead, it is described as a separate entity from the Government of Puerto Rico:

> A corporate and body politic is hereby created as a public corporation and instrumentality of the Government of the Commonwealth of Puerto Rico, attached to the Department, which shall be known as the Puerto Rico and the Island Municipalities Maritime Transport Authority, subject to the control of the Secretary, with legal existence and personality separate from the Government of the Commonwealth of Puerto Rico, its agencies, instrumentalities and political subdivisions. PR. ST. T. 23 § 3202. (Emphasis provided).

Furthermore, the enabling act instead of describing that PRMTA as a public corporation structured to be an arm of the Puerto Rico Government refers to the entity as follows:

> The debts, obligations, contracts, notes, receipts, expenses, accounts, funds, pledges and properties of the Authority, its officials, agents or employees shall be deemed as belongings of said Authority and not as property of the Government of Puerto Rico or of any office, bureau, department, instrumentality, agency, or public subdivision, municipality, agent, official or employee thereof. Id.

Moreover, the enabling act's description of the acquisition of property is also subject to evaluation from the Court:

> By request of the Authority, the Governor of Puerto Rico or the Secretary may acquire in the name and in representation of the Government of Puerto Rico, through purchase, eminent domain or any other legal means, for the use and benefit of the Authority, in the manner provided in this Act and the laws of Puerto Rico on eminent domain, the title of any property or interest thereon that the Authority deems necessary or convenient for its purposes, including its future needs.

The enabling act further sets the rules for construction, operations and purchase contracts as follows:

> (b) **When the estimated sum for the acquisition or work does not exceed twenty-five thousand dollars ($25,000), it may be executed without the need to hold the bidding process or request for bids. Furthermore, it shall not be necessary to hold a public bidding or request for bids in the following cases:**
>
> **(1) When due to an emergency, the immediate delivery of materials, goods and equipment, or the rendering of services is required. PR. ST. T. 23 § 3210.** (Emphasis ours).

Finally, the description of purposes of the creation of the PRMTA is the following:

> The purposes for which the Authority is created and for which it shall exercise its powers are of a public nature for the benefit of the People

of Puerto Rico, and the exercise of the powers conferred by this chapter constitutes the compliance of essential government functions. Every work, project, enterprise and property and their accessories that the Authority deems necessary or convenient to use in order to carry out the purposes of this chapter, are hereby declared of public usefulness. PR. ST. T. 23 § 3212.

Armed with the applicable provisions of law, the Court is ready to resolve the controversies at hand.

## E.    LEGAL ANALYSIS

The Court is called upon to determine whether a dismissal is warranted in favor of PRMTA for being an arm of the Commonwealth of Puerto Rico[3]. Further, the Court must rule upon Aluma's pending motion for partial summary judgment.[4]  However, the Court must first determine as to the instant controversy, whether it is maritime or state law that applies. Consequently, the Court will begin its legal analysis with the determination as to the applicability of maritime law in the instant case.

### A.  Maritime Jurisdiction

After a careful analysis of the legal standard applicable in the instant case, the Court finds that jurisdiction over this dispute stems from Article III of the constitution ([t]he judicial power shall extend to all cases... of admiralty and maritime jurisdiction) and 28 U.S.C. § 1333 ("[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of... [a]ny civil case of admiralty or maritime jurisdiction..."). Hence, maritime law supplies the rule of decision.

---

[3] *See* Docket No. 59.
[4] *See* Docket No. 60.

The Supreme Court has squarely stated that contracts to repair a ship fall within the umbrella of admiralty jurisdiction. *See* <u>Kossick</u>, 365 U.S. at 735. Furthermore, pursuant to maritime law, oral contracts, as the one in controversy, are traditionally regarded as valid. Consequently, Aluma's verbal contract with PRMTA is valid under the applicable maritime law.

The Court emphasizes that the repair and maintenance request of vessel "M/V Cayo Blanco" was issued by the USCG. Without the repair, the vessel was an uncertified maritime vessel. The vessel was repaired on an emergency request of the highest official of the PRMTA to be performed as an "emergency" in order to operate a vessel that served for public transportation to Culebra and/or Vieques from the mainland.

With this jurisdictional hurdle out of the way, the Court may proceed discussing PRMTA's request for dismissal on state immunity grounds. The Court further decides (infra) that PRMTA is not immune to be sued under the Eleventh Amendment.

**B.  *Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)***

PRMTA buttresses it claim of state immunity under the Eleventh Amendment on the following factors:

1. PRMTA is subject to control of the Secretary of the Department of Transportation and Public Works, according to the Marine Transit Act.[5]

2. Two of PRMTA's five board director members are high-ranking Government officials who automatically serve the PRMTA in accordance with their

---

[5] *See* Docket No. 59 p. 12.

Government positions, and a third who is directly designated by the Governor of Puerto Rico.[6]

3. The Governor of Puerto Rico has the power to remove any member from office for cause, upon notice and hearing.[7]

4. PRMTA can request the Governor of Puerto Rico or the Secretary of the Department of Transportation and Public Works to acquire in the name of the Government.

5. PRTMTA's directors, official, and employees are subject to the Commonwealth of Puerto Rico Government Ethics Act, pursuant to their public servant designation.[8]

6. Its purpose is the performance of essential government functions in the mass transportation of the population of Puerto Rico.[9]

PRMTA also compares itself with the PRPA and alleges that such agency is an arm of the state immune from suits absent its consent.[10] *See* Docket No. 59 p. 15. Furthermore, upon the creation of PRMTA, its enabling act transferred property, funds, employees and functions of the PRPA to the PRMTA.

If the Court were to compare both agencies, they are both public corporations of the Commonwealth of Puerto Rico; they were both created with legal existence and personality separate from the Government of the Commonwealth of Puerto Rico; the

---

[6] Id. at 13.
[7] Id.
[8] Id.
[9] Id. at 14.
[10] But PRPA was held to be not an "arm of the state" by the First Circuit. *See* Grajales, 831 F.3d at 29.

Government has active involvement in its public policy and appointments; and the Commonwealth is not to be liable for actions against neither of these corporations.

Moreover, pursuant to its enabling act, PRMTA was created ". . . with legal existence and personality separate from the Government of the Commonwealth of Puerto Rico, its agencies, instrumentalities and political subdivisions."[11] Hence, all that is left for the Court is to conduct the two-step analysis pursuant to <u>Fresenius</u>.

**1)  *How the state structured the entity***

The Government structured PRMTA as separate from the Commonwealth, where ". . . debts, obligations, contracts, notes, receipts, expenses, accounts, funds, pledges and properties of the Authority, its officials, agents or employees <u>shall be deemed as belongings of said Authority and not as property of the Government of Puerto Rico</u>."[12] (Emphasis ours). Its legal existence and personality was structured as separate from the Government of Puerto Rico.[13]

Notwithstanding, the Government has active involvement in its public policy and appointments, which includes designations of board of directors' officials, and power to remove any member from office for cause. Further, PRMTA's employees are public servants subject to the Commonwealth of Puerto Rico Government Ethics Act.

---

[11] PR. ST. T. 23 § 3202.
[12] <u>Id.</u>
[13] <u>Id.</u>

### 2) *Vulnerability of the state's purse*

Pursuant to <u>Fresenius</u>, the second-step is the "most salient factor"[14] in the determination as to immunity under the Eleventh Amendment. PRMTA's enabling act identifies all debts and obligations of the entity as separate from the Government of Puerto Rico. Thus, the Commonwealth's fisc is at no risk when actions are pursued against PRMTA.

Consequently, upon the Court's evaluation of PRMTA's structure pursuant to the First Circuit's ruling on <u>Fresenius</u> and <u>Grajales</u>, PRMTA's Eleventh Amendment immunity contention suffers the same fatality as the PRPA. To wit, although the Government has an active involvement in PRMTA's public policy and appointments, the Commonwealth's fisc is not at risk when actions are pursued against PRMTA. Further, upon a careful review of PRMTA's enabling act, the Government clearly did not structure PRMTA to be an arm of the state, rather it was created as separate from the Commonwealth, where ". . . debts, obligations, contracts, notes, receipts, expenses, accounts, funds, pledges and properties of the Authority, its officials, agents or employees shall be deemed as belongings of said Authority and not as property of the Government of Puerto Rico."[15]

Having found that PRMTA is not an arm of the state but an entity separate from the Government, PRMTA's Motion to Dismiss (Docket No. 59) must be **DENIED**.

---

[14] 322 F.3d at 65.
[15] <u>Id.</u>

## C. Amended Motion for Partial Summary Judgment

Aluma is seeking summary judgment in regards to a claim of $25,000.00 related to an emergency reparation of "M/V Cayo Blanco's" four exhaust systems (mufflers) requested by PRMTA, and performed by Aluma. The request was issued verbally by PRMTA's then Executive Director, Eng. Fernando Cedeño, through the executives that were in charge of service and maintenance of PRMTA's vessels, Mr. Carlos Claudio and Mr. Arturo Vaello. These repairs were performed by Aluma in emergency fashion from January 3 to January 6, 2012 in an emergency basis since they were needed in order to comply with the USCG requirements, to be able to provide transportation services of goods and passengers between the main island and Vieques and Culebra during the on-going holiday season.

PRMTA is refusing to pay for the invoice of such repairs since there is no written contract to that effect. They further allege they are immune under the Eleventh Amendment from suits in the federal court absent its consent, thus a dismissal is warranted. The Court previously ruled that PRMTA is not an arm of the state; hence, it is not protected under the Eleventh Amendment immunity. Consequently, pending before the Court is the ruling regarding Aluma's request for summary judgment.

After a careful review of the legal standard applicable to the instant controversy as well as the positions of both Aluma and PRMTA, the Court understands that there is no genuine issue of fact in controversy that prevents the Court from resolving this matter summarily. There is also no controversy as to the fact that Aluma performed emergency reparations to four exhaust systems from "M/V Cayo Blanco" pursuant to Mr. Arturo

Vaello's instructions[16]. The emergency had to be quickly addressed as the vessel had been grounded by the USCG until the repairs were performed. Further, the emergency reparations were performed and invoiced for the amount of $25,000.00. Such invoice has not been paid by PRMTA.

Withal, many of the allegations sustained by Aluma, were confirmed by Mr. Vaello, fleet maintenance manager of PRMTA (at that time), during his deposition. Pursuant to the Court's undisputed factual findings, Mr. Vaello confirmed the emergency nature of the services that were provided by Aluma, and the fact that he, himself, contacted Aluma and requested that its personnel present themselves at Fajardo, with the necessary equipment, to perform emergency repairs to "M/V Cayo Blanco". Said vessel could not navigate by orders of the USCG without having previously undergone the required repairs and without USCG's inspection of the performed repairs. He further confirmed that such repairs were authorized by PRMTA's Executive Director. Further, once the repairs were finished, "M/V Cayo Blanco" was inspected and approved by Mr. Vaello. Mr. Vaello was the public servant that received and signed Aluma's letter detailing the works that were performed. Additionally, he was the person who received the invoice that was issued by Aluma for the emergency repair works that were performed, approved and accepted by PRMTA.

The Court concludes that the vessel was grounded by the USCG pending the repairs, which were an emergency preventing the vessel to transport passengers to the

---

[16] Fleet Maintenance Manager of PRMTA authorized by then Executive Director, Eng. Fernando Cedeño, to take necessary measures to resolve the emergency situation of "M/V Cayo Blanco".

islands due to inappropriate exhaust systems. There is no doubt that the emergency existed as passengers could have suffered serious respiratory conditions and further the boat could have suffered severe consequential maintenance repercussions.

PRMTA alleges that since Aluma's repair work on vessel "M/V Cayo Blanco" was performed pursuant to a verbal order, it is invalid as a matter of law. They further argue that a purchase order was necessary pursuant to the state's applicable law No. 230 of July 23, 1974, as amended, also known as "Law of Accounting in the Government of Puerto Rico". *See* 3 L.P.R.A. § 283, et. seq. Since no purchase order was ever issued for the repairs performed by Aluma, no contractual obligation emerged and Aluma has no right to collect the amount of $25,000.00 claimed. *See* Docket No. 63. However, the Court notes that PRMTA's own enabling act provides the entity with the power to forego public bidding or request for bids in emergencies where immediate services are required, and the estimated sum for work does not exceed $25,000.00.[17] However, PRMTA's alleged defense of the necessity of an oral contract is superseded by the "supremacy" of the federal law that validates oral contracts enhanced by the emergency situation stated above.

As previously discussed, federal courts have jurisdiction of admiralty and maritime matters because of the recognized necessity of national control over this important commercial area. *See* J. Ray McDermott & Co. v. Vessel Morning Star, 457 F.2d 815 (5th Cir. 1972). Moreover, the Supreme Court has previously held that since maritime

---

[17] *See* PR. ST. T. 23 § 3210.

law is federal law it carries a constitutional implication that ". . . wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant." Kossick, 365 U.S. at 739.

Further and most determinative, under federal maritime law "oral contracts are traditionally regarded as valid". Kossick, 365 U.S. at 734. Even more critical is the fact that "[c]ontracts for the repair of ships are governed by admiralty law." Point Adams Packing Co, 594 F.2d at 766 (citing New Bedford Dry Dock Co., 258 U.S. at 99).

Consequently, the Court cannot accept PRMTA's allegations, since the instant controversy is a matter of maritime law, not state law which has been preempted. The rule of decision in the instant claim is clearly maritime law; hence, PRMTA's verbal order to Aluma is valid, overdue, liquid, and enforceable.

Having found that Aluma's claim for $25,000.00 for a verbal order of emergency repair work on vessel "M/V Cayo Blanco" is valid under maritime law pursuant to Kossick[18], PRMTA is ordered to pay the amounts demanded in the Complaint's Second Cause of Action, plus legal interests since the amount became due, costs and attorney's fees. *See* Docket No. 27 ¶ 24.

## IV.     CONCLUSION

For all the foregoing reasons, the Court hereby **DENIES** PRMTA's motion to dismiss under Federal Rule of Civil Procedure 12(b); and **GRANTS** Aluma's motion for partial summary judgment. As to these matters, the Court need proceed no further.

---

[18] 365 U.S. 731.

Consequently, PRMTA is ordered to deposit in the Federal Court the $25,000.00 object of the Motion for Partial Summary Judgment forthwith.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, on this 5th day of July, 2017.

*S/DANIEL R. DOMÍNGUEZ*
DANIEL R. DOMÍNGUEZ
UNITED STATES DISTRICT JUDGE